**REMITTITUR SUGGESTED, MODIFY and AFFIRM; Opinion Filed December 16, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-01137-CV

**BISHOP ABBEY HOMES, LTD. AND NATHAN HALSEY, Appellants**
**V.**
**BRYON AND PAIGE HALE, Appellees**

**On Appeal from the 439th Judicial District Court**
**Rockwall County, Texas**
**Trial Court Cause No. 1-11-1207**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Brown, and Schenck
Opinion by Justice Lang-Miers

Appellees Bryon and Paige Hale sued appellants Bishop Abbey Homes, Ltd. (BAH) and

Nathan Halsey for fraud, deceptive trade practices, negligence, and other causes of action

relating to the construction of their "dream home" in Rockwall. After a jury trial, the trial court

rendered judgment for the Hales on the jury's verdict.

In eight issues, BAH and Halsey complain that (1) the Hales' suit was barred by

limitations, (2) the economic loss doctrine bars the Hales' damages, (3) judgment against Halsey

individually was error, (4) the Hales' counsel made improper closing arguments, (5) there was

legally and factually insufficient evidence to support the jury's findings of fraud, (6) the damages

awarded in the judgment were excessive, (7) there was legally and factually insufficient evidence

to support the jury's findings of deceptive trade practices, and (8) the Hales' causes of action for

negligence and breach of warranty fail as a matter of law. We suggest a remittitur of the mental

anguish, additional, and exemplary damages awarded in the judgment. In all other respects, we affirm the trial court's judgment. Because all issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

## I. BACKGROUND

The Hales purchased a lot in Rockwall in 2005 and had plans drawn up for their "dream home." In 2006, they met with Halsey, then the owner of BAH, as a potential builder. Based on Halsey's representations as to BAH's expertise, the quality of the home, price, and other material terms, the parties signed a construction contract in early 2006. Halsey assigned David Moses, an electrician, to be the on-site construction supervisor. The Hales did not know, and Halsey did not reveal, that Moses had no experience or familiarity with soils testing and other basic procedures for site preparation and construction and engineering of building foundations. The Hales, having no expertise on the subject, relied on Halsey for advice regarding the proper foundation to be used for their home.

Construction was completed later in 2006 and the Hales moved in. Over the course of the next four years, the Hales experienced substantial water leaks, large cracks in both the exterior and the interior of the home, falling drywall, alarms sounding in the middle of the night, doors failing to open or close, and other problems. They called on Halsey for assistance, and were assured by Halsey's experts, including AGTM Engineering, LLC, the designer of the foundation, that the problems they were experiencing were not due to failure of the foundation of their home. In late 2009, however, the Hales hired their own expert, who reported that the foundation was the source of the problems with the home.

Halsey made assurances to the Hales that he would take personal responsibility "for all actions." By early 2011, however, the Hales concluded that Halsey did not have any intention of

taking responsibility or assuming any of the costs to repair the home. They brought suit against Halsey, BAH, and AGTM in August 2011.

The case proceeded to jury trial in 2014. The Hales and AGTM reached a settlement after several days of testimony. The jury answered questions relating to the Hales' deceptive trade practices, negligence, and fraud claims against Halsey and BAH. The trial court rendered judgment on the jury's findings in favor of the Hales. This appeal followed.

## II. LIMITATIONS

In their first issue, appellants argue that the Hales' fraud and DTPA[1] causes of action are barred by the applicable statutes of limitations.

### A. Facts

The Hales signed a construction agreement with BAH on February 22, 2006. They filed suit against appellants on August 31, 2011.

On May 25, 2007, Bryon[2] sent an email to Halsey identifying "warranty repairs" needed at the Hales' home. In addition to listing three "major leaks" at a window, a door, and a ceiling, Bryon stated that "[w]e have several other punch out items that need to be addressed as well such as foundation concerns." On June 27, 2007, Bryon sent an email to Halsey regarding a water intrusion inspection that had been conducted at the home. The email included a request that Halsey "take a look at the crack above the side garage door which appears to be caused by the foundation." Later the same day Halsey responded:

> Bryon-
> Just hung up the phone with Perry [identified at trial as a mortgage company lender]. If you want to get an attorney involved, that is your

---

[1] Texas Deceptive Trade Practices–Consumer Protection Act, TEX. BUS. & COM. CODE ANN. §§ 17.41–17.63 (West 2011 & Supp. 2015) ("DTPA").

[2] For clarity we refer to the Hales by their first names.

choice, just give me a heads up and I'll pass my attorney's contact info and we can let them handle it.

However, I think it's a bit premature for you to spend money on legal fees. Your inspection report may seem overwhelming, but it's all issues that can easily be addressed, and we'll stand by it 100% until everything is totally corrected and you guys are happy.

Jerry and I will see you 1st thing Friday morning. We'll discuss the action plan, and get you comfortable with how we proceed here.

In response to the Hales' concerns, Halsey engaged Ronald E. Davidson, P.E. to inspect the foundation at the Hales' home. Davidson issued a "General Structural Initial Foundation Inspection" report dated August 31, 2007, concluding that the home had only "minor movement along the perimeters and interior" that "is within the normal construction standards." Davidson also explained that "the drainage was not adequate." He concluded that "[w]ith proper maintenance foundation movements can be held to a minimum." Bryon testified at trial:

Q: In 2007 . . . there's an engineer that comes out and says the foundation is normal. Do you see that?

A. Yes, sir.

Q. Did you talk to Mr. Halsey about it?

A. Yeah. I was – I was glad to know that it wasn't a foundation issue.

Q. Mr. Halsey told you it's normal?

A. Yes, sir.

Q. And this engineer told you it was normal?

A. Yes, sir.

Q. Did you believe it?

A. Absolutely.

After this reassurance that the foundation was "normal," the Hales did not raise any further concerns with it until 2009. In an email dated May 10, 2009, Bryon notified Halsey that

"I believe we have some serious foundation issues." In response, Halsey requested that AGTM conduct an investigation of the foundation. In a report dated June 29, 2009, AGTM engineer Ian G. Ray explained the results of his investigation, concluding "[i]n summary, the measured movement does not reflect a failure in the foundation." Halsey sent the report to the Hales on July 9, 2009, explaining that "I ordered this report from AGTM Engineering so they could determine what is going on with the foundation. At first glance, I believe they are suggesting there is a drainage issue." On July 23, 2009, Bryon responded by e-mail to Halsey expressing "huge relief to know that the foundation is still in the specified tolerance."

Later in 2009, however, the Hales sought independent advice regarding the foundation. In a report dated November 6, 2009, Prather Engineering Consultants reported to the Hales that the foundation of the home, not drainage, was causing the problems experienced at the home. Harold Prather, a professional engineer, testified at trial that after conducting his investigation, he recommended a chemical injection to remedy the problem. The injections were undertaken in early 2010 but were not successful; Prather testified that "[t]he house continued to move and that's where we are today." Bryon testified that he obtained Halsey's approval before the injections were undertaken.

In January 2010, Halsey emailed the Hales with an "action plan for the Hale house." He recommended that "Homeowner and Builder appear on one team, with Builder (Bishop Abbey) taking the lead on approaching engineer with the facts." He discussed "shar[ing] the hard costs that were (and are) required to fix the issue with a permanent solution." In July 2010, Halsey stated in an email to Bryon that "I personally take responsibilities for all actions," but explaining that "in the short term, I'm not sure how I am going to assist financially" because he was not capable of "writing a check today" although "not [because] I don't have a desire to assist where I feel there is responsibility."

In January 2011, Bryon emailed Halsey that the engineers "believe the injections are beginning to work and the foundation is showing signs of stabilizing." He explained that the engineers recommended not undertaking any cosmetic repairs "until they return in May for final measurement." Bryon asked, "[c]an I count on you financially in May 2011 for repairs and the injection invoice?" Halsey responded by inquiring "[w]hat would you estimate the repairs to be and the injection invoice, and beginning in May but spread over what period[?] I guess I need a clear picture of what the cash flow expectations would be from me." At trial, Bryon testified that in 2011, he received "more promises" from Halsey, but:

Q. So ultimately those promises, you couldn't live with them anymore; is that right?

A. Yes, sir.

Bryon testified that Halsey "led me down the primrose path that I'm going to be taken care of 100 percent to my satisfaction, and that Mr. Halsey said that he is 100 percent responsible and strung us along for eight years until we finally had to [file suit] . . . just to try and get some relief and this fixed." He testified that he did not know "until we got in this lawsuit" that the house did not comply with the requirements of the soils and engineering reports. He believed that the soil and the pad had been properly prepared until he learned to the contrary in the course of the litigation. Bryon also testified that he paid for a ten-year structural warranty and was not aware that appellants did not provide it until after suit had been filed.

The Hales filed suit in August, 2011. In January, 2012, the Hales retained a structural engineer to evaluate their home. Later in 2012, the Hales obtained engineering reports revealing to them for the first time that none of the soil preparation recommended in the original geotechnical report had been undertaken or completed when their home was built. Brian Eubanks, a structural engineer, testified that the Hales' home had "unreasonable distress" resulting from flaws in the foundation design. Eubanks explained that the elevation of the

–6–

foundation was not high enough to allow drainage, the slab was not raised, and the building pad was "set too low."

Eubanks compared the original 2006 soils report, prepared prior to construction of the Hales' home, with the 2012 soils report prepared in the course of the litigation. He explained that the soils report is "critical" to a design engineer, explaining, "you cannot properly design a foundation on expansive soils without knowing what the expansive soils are." His 2012 testing revealed that the recommendations in the 2006 soils report were not followed. Eubanks testified he would give the builder "a failing grade" for both pad preparation and elevation of the foundation.

### B.  Standards of Review

Appellants contend (1) the trial court should have granted their motion for directed verdict and motion for judgment notwithstanding the verdict (JNOV) because the Hales' claims for fraud and deceptive trade practices were barred by limitations, and (2) the evidence is legally and factually insufficient to support the jury's findings of the dates on which the Hales discovered appellants' wrongful conduct.

We review a trial court's decision to grant or deny a motion for directed verdict and a motion for JNOV under the legal sufficiency standard of review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (test for legal sufficiency is same for directed verdict, JNOV, and appellate no-evidence review). We credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). We will uphold the jury's finding if more than a scintilla of competent evidence supports it. *Id.*

Appellants bore the initial burden of pleading, proving, and securing findings to sustain their affirmative defense of limitations. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517

(Tex. 1988).  A legal sufficiency evidentiary challenge on an issue on which an appellant bears the burden of proof requires that the appellant demonstrate the evidence conclusively established all vital facts to support the issue.  *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 188 (Tex. App.—Dallas 1996, no writ).  Evidence is conclusive "only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case."  *City of Keller*, 168 S.W.3d at 816.

To review a challenge to the factual sufficiency of the evidence, we must weigh all of the evidence in the record.  *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam).  We view the evidence in a neutral light and set aside the finding only if it is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust.  *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

### C.  Applicable Law

The statute of limitations for a DTPA claim is two years.  TEX. BUS. & COM. CODE ANN. § 17.565 (West 2011).  The period begins to run within two years after the date on which the false, misleading, or deceptive act or practice occurred or "within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice."  *Id.*

The statute of limitations for a fraud claim is four years.  *Anderson v. Cocheu*, 176 S.W.3d 685, 689 (Tex. App.—Dallas 2005, pet. denied).  In an action for fraud, limitations begins to run when the fraud is perpetrated, or if the fraud is concealed, from the time it is discovered or could have been discovered by the exercise of reasonable diligence.  *Woods*, 769 S.W.2d at 517.  Although appellants bore the initial burden of proof on their limitations defense, the Hales bore the burden of proving and obtaining favorable findings on fraudulent concealment and the discovery rule.  *Id.* at 518.

A cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *See Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)). A "legal injury" is "an injury giving cause of action by reason of its being an invasion of a plaintiff's right . . . be the damage however slight." *Murphy*, 964 S.W.2d at 270 (quoting *Houston Water-Works Co. v. Kennedy*, 8 S.W. 36, 37–38 (Tex. 1888)). The discovery rule is an exception to the legal injury rule. *Id.* Under the discovery rule, an action does not accrue until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury. *Id.* (citing *S.V.*, 933 S.W.2d at 4). The discovery rule applies where, as here, the plaintiffs have alleged fraud or fraudulent concealment. *Id.*

### D. Analysis

Appellants contend the Hales knew there were foundation problems with the home by May 25, 2007 but did not file suit until August 31, 2011. The Hales counter that because their claims are for fraud, their knowledge of foundation problems is not the determinative issue; rather, "the issue before the jury was when the Hales should have discovered that Halsey committed fraud and DTPA violations." The Hales contend that Halsey continued to make false representations through early 2011, and they "relied upon those representations in not bringing suit." In the alternative the Hales argue the statute of limitations did not begin to run until November 2009, when they hired their own expert to inspect the property.

We conclude the Hales' suit was not barred by limitations. The evidence offered at trial and summarized above showed that each time the Hales raised a concern about the foundation, they were assured by one of appellants' experts that the foundation was not the cause of the problems the Hales observed. In 2007, Davidson reported the foundation was normal. In 2009, Ray reported that "the measured movement does not reflect a failure in the foundation." It was

only in November 2009, when the Hales retained their own expert, that they were told the foundation was causing the problems experienced at the home. They brought suit less than two years later.

In contrast, in the cases on which appellants rely, the homeowners had not been assured, twice, by the builders' experts that their foundations were normal. *See J.M. Krupar Constr. Co. v. Rosenberg*, 95 S.W.3d 322, 326–27, 331 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (limitations began to run at time homeowners received their own experts' reports showing that foundation had failed); *Dean v. Frank W. Neal & Assocs.*, 166 S.W.3d 352, 356–57 (Tex. App.—Fort Worth 2005, no pet.) (limitations began to run when experts met to discuss use of chemical injections to remedy foundation problems, and homeowners were aware of meeting and its purpose). And in *Dean*, although the plaintiffs offered evidence they were told the "minor" cracks they observed were "normal cosmetic cracks that would occur with settlement," there was "no indication as to who assured them so," *id.* at 356, in contrast to the two expert reports supplied to the Hales by appellants in this case.

The Hales rely on *Carpenter v. Holmes Builders, Inc.*, No. 11-02-00132-CV, 2004 WL 306130, at *5 (Tex. App.—Eastland Feb. 19, 2004, pet. denied) (mem. op. and order), in support of their argument that limitations did not begin to run until November 2009. In *Carpenter*, as here, the Carpenters received expert opinions from two engineers and their builder that foundation movement at their home was within acceptable limits. *Id.* at *3–4. More than a year later, a workman with experience in foundation repair recommended that the Carpenters hire an expert to check on cracks he observed at the home. *Id.* at *4. The Carpenters hired an engineer who reported in February 1998 that the foundation was defective. *Id.* The court concluded there was some evidence to support the jury's finding that the Carpenters' DTPA claim did not accrue

until February 1998. *Id.* at *5. Similarly, we conclude that there was some evidence here to support a finding that the Hales' claims did not accrue until November 2009.[3]

Further, there is evidence that Halsey concealed material facts from the Hales. There was evidence that Halsey knew, but the Hales did not, that (1) Halsey's site supervisor was an electrician who knew nothing of the basic engineering of a home foundation; (2) no one with the necessary expertise was ensuring that the foundation of the house was properly constructed; (3) Halsey did not intend to provide items the Hales paid for under the contract such as compaction testing, final grading, or a structural warranty; and (4) Halsey's assurances that he would bear personal responsibility for "all actions" were false. Had the Hales known these facts, they might have sought recourse on an earlier date. Instead, there was evidence from which a jury could conclude that the Hales exercised reasonable diligence by bringing problems to Halsey's attention and then relying on the advice they received from Halsey and his experts.

We conclude the Hales' claims were not barred by limitations. We overrule appellants' first issue.

### III. Sufficiency of the Evidence

The trial court rendered judgment against Halsey on the jury's findings of fraud, and against BAH on the jury's findings of violations of the DTPA. In their fifth issue, appellants challenge the legal and factual sufficiency of the evidence to support the jury's fraud findings against Halsey. In their seventh issue, appellants challenge the legal and factual sufficiency of

---

[3] Appellants also urge that no evidence supports the jury's findings of specific dates on which the Hales "in the exercise of reasonable diligence" should have discovered (1) appellants' failure to comply with a warranty (March 31, 2011), and (2) appellants' false, misleading, deceptive, and unconscionable acts or practices (July 9, 2012). Bryon and Paige both testified that Halsey was making reassurances in January 2011 that he would take responsibility, but in the first part of 2011, the Hales concluded that Halsey was just "stringing them along." Soils testing performed in the summer of 2012 revealed, for the first time, the lack of site preparation. Thus, there was some evidence to support the jury's findings of March 31, 2011 and July 9, 2012 as the applicable dates. And in any event, as we have discussed, the Hales brought suit within two years of the date their causes of action accrued.

–11–

the evidence to support the jury's findings that BAH violated the DTPA. Appellants challenge the sufficiency of the evidence on each element of these causes of action.

## A. Standard of review

When a party challenges the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports it. *City of Keller*, 168 S.W.3d at 822. We credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not. *Id.* at 827. If the evidence would permit reasonable and fair-minded people to reach the finding under review, the legal sufficiency challenge fails. *Id.* When a party challenges the factual sufficiency of the evidence, we consider all of the evidence and will set aside the finding only if the evidence supporting it is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and manifestly unjust. *Id.* In conducting our review, we are mindful that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819; *Defterios v. Dallas Bayou Bend, Ltd.*, 350 S.W.3d 659, 664 (Tex. App.—Dallas 2011, pet. denied).

## B. Fraud claim against Halsey

To establish their fraud claim against Halsey, the Hales were required to prove (1) Halsey made a material misrepresentation that was false; (2) Halsey knew the representation was false when made or made it recklessly as a positive assertion without any knowledge of its truth; (3) Halsey intended the Hales to act upon the representation; and (4) the Hales actually and justifiably relied on the misrepresentation and suffered injury. *See Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 303 (Tex. App.—Dallas 2009, no pet.) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time

–12–

it was made. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

The Hales contended and offered evidence that Halsey made misrepresentations about (1) his experience as a home builder, (2) the quality of the home he would build, (3) the work to be undertaken, (4) the site superintendent's qualifications and experience, (5) a ten-year structural warranty, (6) the cost of construction and the price of the home, (7) site preparation, (8) grading and drainage, (9) requirements for the foundation, and (10) his intention to take responsibility for repair to the Hales' home. Halsey counters that these complaints are only breaches of contract, not fraud, and in any event would be the fault of BAH or third parties to whom BAH delegated responsibility, not Halsey individually. We disagree.

Halsey's own trial testimony supported the Hales' allegations. As to expertise in constructing homes, Halsey testified:

> Q. So you are a builder?
>
> A. I was a builder.
>
> Q. Are—were you an expert in home building?
>
> A. I wouldn't consider myself an expert in building, no.
>
> Q. Did you tell the Hales you were not an expert in home building when they hired you and agreed to pay your fee for this job?
>
> A. They didn't ask me if I was an expert in home building.

Halsey also told the Hales that Moses was qualified as the onsite superintendent:

> Q. Now, why didn't you tell the Hales you were not an expert? They were hiring you to build their dream house. Why didn't you tell them that you weren't that?
>
> A. The Hales asked me what was our experience, a list of homes that we built. What was the experience of our team, construction managers, and I provided them that information.

Q. You told them that the construction superintendent on their home was or was not qualified to be a construction superintendent on that home?

A. Told them he was qualified to be a construction superintendent on their home.

But prior to his appointment as construction supervisor, Moses, an electrician, had worked for Halsey "wiring homes." At trial, Moses testified that the subsurface investigation—the "soils report"—for the Hales' lot did not "look in any way familiar" to him, and he had "no idea" that "there was a report like this." When asked whether he tried to comply with the soils report's recommendations in the construction of the Hales' home, Moses testified, "Sir, I've never seen that before." He testified:

Q. So–does it surprise you to learn that this soil report was directed to Bishop Abbey and that the company had this report and the company was informed of what to do with the pad site before you did your work out there? Does that surprise you to learn that now?

A. Yeah. I'm kind of surprised.

Q. Why?

A. Honestly, I didn't know. . . .
. . .

Q. Without any doubt, these instructions were not followed on the—on the Hale house we're here about; is that accurate?

A. I would say so. I was in charge of that.

Halsey testified he had not "seen conclusive evidence that the pad site is not proper," even though he conceded that the recommendations in the soils report were not followed and could not explain why. Halsey testified that "per our [company] policy and procedure," both Moses and Andrew Mitchell, the excavation contractor, would have had a copy of the soils report during site preparation. Both Moses and Mitchell, however, had already testified to the contrary.

Additionally, although Halsey conceded that the budget he prepared and gave the Hales included a "2/10" home warranty[4], and that the Hales paid the designated amount for the warranty, he testified that no home warranty was actually included:

> Q.     Did [the Hales] pay you for [a 2/10 warranty]?
>
> A.     I wouldn't—when we get to that part, it's a little bit difficult to say that they paid for that.
>
> Q.     So you are denying that these good folks paid for the 2/10 warranty. Did I get that right?
>
> A.     What I'm saying is, the line item you referenced earlier includes six items in that line item. Those six items, the cost of those six items exceeds the dollar amounts in that field, so it's tough for me to say that they paid for the 2/10 warranty.

But Glenda Lopez, Halsey's employee, testified that the Hales' home should have been enrolled in the warranty program. Lopez conceded the Hales had paid for the warranty, but testified that Moses told her he would handle all the paperwork for the Hales' warranty. Moses, however, testified that he had never heard of a "2/10 warranty or structural warranty" and neither took any action to enroll the Hales' home in a warranty program nor told Lopez he would do so. Appellants stipulated that no warranty was ever purchased for the Hales' home.

Halsey also denied representing to the Hales that they would pay a fixed price for construction of their home. But the contract itself provided, "This is a Fixed Cost Contract wherein the BUYER will pay the BUILDER a specific price for performing the work described herein . . . ." And the Hales paid the fixed price. Nonetheless, Halsey testified that he prepared and provided the contract and budget only as preliminary documentation for the Hales to use in obtaining their mortgage loan. He testified that he did not intend for the contract and budget to impose limits on the amounts the Hales would actually be required to pay:

---

[4] A trial witness explained that a "2/10 warranty" is a "ten-year structural warranty on the house and a two-year on the HVAC and mechanical."

–15–

Q. But you had already contracted, sir. You had already contracted for a fixed fee, right? And you had already put down in the budget, Exhibit 26, what the foundation fee was.

A. Would you like an explanation?

Q. I'm asking you, is this true? Had you already, in January, put down a foundation fee of $18,324, and then you said "assumes post-tension. Extra for piers, cart and form system." Right?

A. Bryon asked me to prepare a contract for his lender which was a requirement to start the loan process. I told Bryon at that time we do not have the soils report. It will take six to ten weeks to complete. He was trying to be in his home by the summertime and asked, as a favor, if I would prepare a contract for his lender to start the loan application, which we obliged. And I told Bryon the whole time, I cannot guarantee that a pier-and-beam foundation would not be required.

Hence goes to my point, this was not a fixed fee contract because Bryon knew at the time we didn't know the foundation, so we operated off of this line-item budget.

Q. Well, why did you sign it? Why did you sign the contract for 363,000?

A. It was a requirement for his lender, so Bryon asked me to sign it.

Halsey blamed the Hales for their home's structural problems. He testified that "[t]he ultimate decision was Bryon's" whether to use a post-tension system rather than a pier and beam foundation. Halsey testified that Bryon would have made the decision based on the advice of Antonio Medina of AGTM, but conceded that Bryon and Medina had never spoken. He conceded that Bryon would not have had copies of the experts' reports with the information necessary to make the decision. Bryon testified that he relied on Halsey's advice regarding the proper type of foundation, having no expertise in the matter himself. He testified that Halsey assured him "the post-tension would do the job." The record includes an April 2006 email from Bryon to Halsey asking, "Hi Nathan, What did you find out yesterday regarding the soil test? Do you know what type of foundation will be required?" Halsey denied giving an opinion on the

–16–

subject to the Hales, testifying that he "gave more of a reference"; he "wouldn't call it an opinion."

Halsey also testified that Bryon took on the responsibility for "drainage" at the site. Halsey testified that drainage was "out of his scope," so neither he nor BAH was responsible for any problems arising from lack of drainage. Bryon testified that he agreed to take on the landscaping and irrigation himself after Halsey's contractor bid three times the contract price for it. He testified he received a credit from BAH for the landscaping, but not for drainage work:

> Q. Change order, the landscape credit. Where does it say you are doing the drainage?
>
> A. I don't see it on here. *I wouldn't know how to do the drainage. I wouldn't sign up for that.* (Emphasis added)

Bryon further testified he would not have known the requirements for drainage or for the related grading to allow specific drainage on the lot. Rough and final grading were separate line items under the contract. Halsey conceded that final grading was "important" because "[i]t goes to addressing the drainage on the home." There was conflicting evidence as to whether final grading was ever done.

Jerry Thornton, a former BAH employee, also testified about grading and drainage on the site. He testified that although the Hales' lot is "flat," the land "all grades in one direction," so that "there's quite a bit of runoff that would run essentially right into the front of the home." In addition, the sidewalk and the driveway are "not raised high enough to allow sufficient drainage, positive drainage, away from the structure itself." Thornton concluded that because of the "negative slope" toward the home, water "would run towards the home thus intruding underneath the slab and compromising the substrate of the building."

Additionally, the plans the Hales provided to Halsey called for steps leading up to porches in the front and back of the house. The steps and porches would have required construction of a higher foundation. Halsey testified the Hales decided against the raised foundation, based on cost. This was directly contrary to the testimony of both Bryon and Paige that the raised porches were a key feature of the home they paid Halsey and BAH to build, and they were not aware until after the foundation was in place that there would be no steps and no raised porches. Halsey denied that the Hales ever voiced a complaint about the issue, contradicting specific testimony from both of the Hales of a meeting at the site during which Paige was in tears. In fact, Halsey testified that he and the Hales discussed the matter prior to construction, and the Hales decided "not to incur the cost." Both of the Hales adamantly denied any such decision.

Halsey testified at trial that he was not personally responsible for the representations he made to the Hales: "I do not personally, outside the scope of my job as manager with Bishop Abbey Homes, take responsibility personally, no." He admitted to assuring the Hales in a 2010 email that "I personally take responsibility for all actions." But he testified that his statement did "not mean personally outside the scope as manager of Bishop Abbey Homes, no."

The Hales testified that they relied on Halsey's expertise and on his representations. And they offered fact and expert testimony about the damages they suffered as a result of their reliance.

In summary, there was testimony from which the jury could find that (1) Halsey made material misrepresentations that were false; (2) Halsey knew the representations were false when he made them, or made them recklessly as a positive assertion without knowledge of their truth; (3) Halsey intended the Hales to act on the representations; and (4) the Hales actually and justifiably relied on the misrepresentations and suffered injury. *See Esty*, 298 S.W.3d at 303.

We conclude there was legally and factually sufficient evidence to support the jury's findings of Halsey's fraud. *See id.* We overrule appellants' fifth issue.

### C. DTPA claim against BAH

To establish their DTPA claim against BAH, the Hales were required to prove (1) they are "consumers," (2) BAH engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of their damages. *See Doe v. Boy's Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). BAH does not challenge the Hales' status as consumers, but contends there is legally and factually insufficient evidence to support the jury's findings of false, misleading and deceptive acts that were a producing cause of damage to the Hales.

The jury was instructed:

"False misleading, or deceptive act or practice" means any of the following:

1. Representing that the residence or the construction had or would have characteristics that it did not have;

2. Representing that the residence or the construction are or will be a particular quality if they were of another (or);

3. Representing that an agreement confers or involves rights that it did not have or involve (or);

4. Failing to disclose information about the residence or the construction that was known at the time of the transaction with the intent to induce the Hales into a transaction they otherwise would not have entered into if the information had been disclosed.

The jury answered this question "Yes" as to both BAH and Halsey, and also answered "Yes" to the question asking whether there was unconscionable conduct by both Halsey and BAH. Appellants contend that neither Halsey nor BAH "made any representations regarding the quality of the home or facts concerning the transaction that could possibly support a DTPA violation." They also contend that they could not have had knowledge of design or construction defects at the time the contract was signed in 2006, and in any event, the Hales' own expert

–19–

testified that the foundation problems were due to AGTM's design. But the jury could have found a deceptive trade practice based on any one of the definitions included in the charge, and the Hales offered evidence of all four. In short, they offered evidence, discussed above, of Halsey's knowing misrepresentations, failures to disclose material information, and false promises that were a producing cause of damage. And this evidence supports the jury's liability findings against both BAH and Halsey individually.

We conclude there was legally and factually sufficient evidence to support the jury's findings that BAH engaged in deceptive trade practices that were a producing cause of damage to the Hales. We overrule appellants' seventh issue.

### IV. IMPROPER JURY ARGUMENT

In their fourth issue, appellants complain of five arguments made by the Hales' counsel in closing: (1) appellants would "walk" unless the jury found a recent date on which the Hales discovered their claims; (2) Halsey is wealthy; (3) Halsey failed to call witnesses; (4) commenting on "the depth and breadth of the lies that Mr. Halsey told you"; and (5) informing the jury that collecting the judgment from BAH would be difficult or impossible, so Halsey should be held liable.

Appellants objected at trial to some of these arguments but not others. Appellants made objections to the following arguments as "improper closing" or "improper testimony":

- "[W]e're going to be chasing [Nathan Halsey] around for a long time." The trial court ruled: "Sustained. Jury disregard that last statement."

- "And I can tell you: Getting a judgment in this case and collecting are two very different things." The trial court also sustained this objection. Appellants did not request an instruction that the jury disregard the statement.

- Appellants engaged in a "con to string the Hales along" but were now arguing that the Hales waited too long to sue. The trial court overruled this objection.

- Finding a date earlier than March 31, 2011 "will bar the Hales' claims against Mr. Halsey." This objection was also overruled.

Appellants did not raise any other objections to closing argument until their motion for new trial. But they contend that they properly preserved their complaints for appeal because the arguments were incurable.

## A. Applicable law and standard of review

A litigant is entitled to have his counsel argue the facts of the case to the jury. *Clark v. Bres*, 217 S.W.3d 501, 510 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Tex. Sand Co. v. Shield*, 381 S.W.2d 48, 57–58 (Tex. 1964)). Reasonable inferences and deductions from the evidence are permissible in closing argument. *PopCap Games, Inc. v. MumboJumbo, L.L.C.*, 350 S.W.3d 699, 721 (Tex. App.—Dallas 2011, pet. denied). Hyperbole is also generally a permissible rhetorical technique in closing argument. *Id.* Counsel may comment on the credibility of witnesses. *See id.* at 722 (arguing that jury should accept one witness's opinion instead of another's was not improper). And as long as closing arguments are based on the evidence, attorneys may suggest the correct answers to the jury questions. *Clark*, 217 S.W.3d at 511. Trial counsel should be given wide latitude in arguing the evidence and the reasonable inferences from the evidence to the jury. *Id.* at 510.

Error as to improper jury argument must ordinarily be preserved by a timely objection and request for an instruction that the jury disregard the improper remark. *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009); *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (preservation of error by timely objection which is overruled). A complaint of incurable jury argument, however, may be asserted and preserved in a motion for new trial, even in the absence of a timely objection during trial. *Phillips*, 288 S.W.3d at 883; TEX. R. CIV. P. 324(b)(5). "The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would

have agreed but for such argument.'" *Phillips*, 288 S.W.3d at 883 (quoting *Goforth v. Alvey,* 271 S.W.2d 404, 404 (Tex. 1954)). When an argument is so inflammatory that its harmfulness could not be eliminated by an instruction to the jury to disregard it, the prejudicial nature of the argument is so acute that it is "incurable." *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex. 1968).

But incurable argument is rare. *Phillips*, 288 S.W.3d at 883. Cases finding incurable harm "typically involved unsubstantiated attacks on the integrity or veracity of a party or counsel, appeals to racial prejudice, or the like." *Id.*; *see also Wilhoite v. Sims*, 401 S.W.3d 752, 763 (Tex. App.—Dallas 2013, no pet.) (previously-recognized types of incurable argument have included appeals to racial prejudice, use of inflammatory epithets such as "liar," "fraud," "faker," "cheat," and "imposter," and unsupported charges of perjury and witness tampering). "[I]ncurable argument is that which strikes at the very core of the judicial process." *Phillips*, 288 S.W.3d at 883.

The test is the amount of harm caused by the argument. *Estate of Finney*, 424 S.W.3d 608, 622 (Tex. App.—Dallas 2013, no pet.) (citing *Penalver*, 256 S.W.3d at 680). To obtain a reversal on the basis of incurable jury argument, "the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex. 1979); *see also* TEX. R. APP. P. 44.1(a) (no reversal on appeal unless error complained of probably caused rendition of improper judgment). We examine the entire record to determine the argument's "probable effect on a material finding." *Reese*, 584 S.W.2d at 840.

## B. Analysis

### 1. Date of discovery of claims

Appellants first complain that counsel's closing argument about the Hales' discovery of their claims improperly informed the jury of the effect of its answers. It is improper under special issue submission to advise the jury of the effect of their answers. *See Cooper v. Argonaut Ins. Co.*, 430 S.W.2d 35, 39–40 (Tex. App.—Dallas 1968, writ ref'd n.r.e.). But the error is not reversible if, in light of the entire record, the argument did not probably cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *Magic Chef, Inc. v. Sibley*, 546 S.W.2d 851, 857 (Tex. App.—San Antonio 1977, writ ref'd n.r.e.).

As we have discussed, the evidence supported a finding that Halsey and BAH fraudulently concealed their wrongdoing until November, 2009, when the Hales obtained their own expert report revealing that the foundation was in fact the cause of damage to their home. Reviewing the entire record, the Hales proved that their suit filed in August 2011 was not barred by limitations. Any error in overruling appellants' objections to counsel's argument, then, did not cause the rendition of an improper judgment. *See Magic Chef, Inc.*, 546 S.W.2d at 857.

Appellants also argue that "there was no evidence presented before the jury that the statute of limitations had been asserted as a defense." Without citation to authority, they contend the argument about the Hales' discovery of their claims was incurable because the Hales' counsel "introduced limitations to the jury." But, as we have discussed, the Hales bore the burden of obtaining favorable findings on fraudulent concealment and the discovery rule. *See Woods*, 769 S.W.2d at 517. And the record reflects that Bryon testified about how he would respond to a claim by Halsey that he waited too long to sue. There was also other evidence supporting a finding that appellants fraudulently concealed their wrongdoing. The jury was asked, in five different questions in the charge, to determine the date on which the Hales should

have discovered appellants' wrongful conduct. The Hales' counsel could argue that the evidence supported answers reflecting particular dates of discovery. *See Clark*, 217 S.W.3d at 511. The trial court did not err by overruling appellants' motion for new trial regarding this argument.

### 2. Halsey's wealth

Appellants next complain of counsel's arguments about Halsey's wealth. Halsey's net worth, however, was relevant to the jury question on exemplary damages. And Halsey and BAH did not seek a bifurcated trial; the jury charge inquired about both actual and exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.009 (West 2015) (court shall provide for bifurcated trial "on motion by a defendant"). Additionally, appellants made no objections at trial to the arguments about Halsey's wealth, and the arguments do not fall into any category courts have recognized as incurable. *See Wilhoite,* 401 S.W.3d at 763. Instead, the arguments focused on the credibility of Halsey's claim that he had a negative net worth when there was also evidence showing that, among other assets, Halsey owned 80% of an entity that owned two boats, a lake house, and a $1.2 million lot in University Park. The arguments about Halsey's wealth were based on the evidence, and were not so inflammatory or prejudicial that a withdrawal of the arguments or an instruction by the trial court to disregard could not have cured any harm. *See Estate of Finney*, 424 S.W.3d at 622–23. Accordingly, we conclude the trial court did not err when it denied appellants' motion for new trial because the arguments regarding Halsey's wealth, even if improper, were curable. *See id.*

### 3. Failure to call witnesses

Appellants' next complaint is that counsel argued that Halsey did not bring any witnesses to support him. Without citing authority, they contend the argument "violated the Orders entered on the parties' Motions in Limine." But if an order in limine is violated, the party seeking to exclude the improper evidence must object immediately after the information is revealed, or the

complaint is waived. *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 760 (Tex. 2013) (protective limine order alone does not preserve error; timely objection is necessary). The trial court did not err by overruling appellants' motion for new trial on this issue.

### 4. **Halsey's veracity**

Appellants next complain of counsel's argument that "[t]he depth and breadth of the lies that Mr. Halsey told you is, frankly, I have not seen it in my 32 years." Appellants did not object to this argument at trial, but complained in their motion for new trial that the argument was incurable.

Here, the Hales sought to prove that Halsey fraudulently induced them to enter into a contract with BAH and made false promises in order to prevent them from filing suit. The credibility of Halsey's testimony and evidence was a matter for the jury's determination. The argument was made during counsel's summary of the evidence regarding misrepresentations made by Halsey to the Hales. Trial counsel may properly discuss the reasonableness of the evidence, the reasonable inferences from the evidence, the probative effect of the evidence, or the lack of probative effect. *See, e.g., Via Metro. Transit Auth. v. Barraza*, No. 04-13-00035-CV, 2013 WL 6255761, at *13–14 (Tex. App.—San Antonio Dec. 4, 2013, pet. denied) (mem. op.) (argument that employee of bus company "gives two different stories" about bus accident "constituted reasonable deductions and inferences from the evidence that was before the jury");

Appellants rely on *Cottman Transmission Systems, L.L.C. v. FBLR Enterprises, L.L.C.*, 295 S.W.3d 372, 380 (Tex. App.—Dallas 2009, pet. denied), to support their contention that counsel's argument was incurable. In *Cottman*, we explained that "[t]he previously recognized types of incurable argument have included . . . the use of inflammatory epithets such as 'liar.'" *See id.* But in *Cottman*, we concluded that the argument in question—a reference to a witness as a "Philadelphia lawyer"—was not incurable. *Id.* Although "the comment might have been

intended to focus the jury's attention on the fact that [the witness] was not a local attorney," the argument was not an "inflammatory epithet or personal attack," and was based on the witness's testimony that he was graduate of a law school in Philadelphia. *See id.* Rather than support appellants' contention that the argument about Halsey's veracity was incurable, *Cottman* follows the well-established rule that argument is incurable only where a complaining party "show[s] that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects.'" *Id.* (quoting *Penalver*, 256 S.W.3d at 680–81). Appellants did not make the required showing here.

The Hales presented evidence at trial from which the jury could find that Halsey made representations that were false. Byron testified more than once that a specific statement in Halsey's testimony was a "complete falsehood." It was not improper for the Hales' counsel to discuss this evidence in closing argument. *See id.* Any error or harm from counsel's use of hyperbole in his discussion could have been cured by an objection and instruction from the trial court. *See PopCap Games, Inc.*, 350 S.W.3d at 721. The argument was not "so extreme that a 'juror of ordinary intelligence could have been persuaded . . . to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Phillips*, 288 S.W.3d at 883 (quoting *Goforth*, 271 S.W.2d at 404). The trial court did not err by denying appellants' motion for new trial complaining of closing argument about Halsey's false representations to the Hales.

5. **Enforceability of judgment**

The trial court sustained appellants' two objections to counsel's argument that collecting on a judgment would be difficult. When ruling on one of the objections, the trial court also instructed the jury to disregard the argument. And, in the absence of evidence to the contrary, we presume the jury followed the court's instruction. *See Turner, Collie & Braden, Inc. v.*

–26–

*Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex. 1982) (appellate court must assume jury properly followed trial court's instruction regarding admission of evidence for limited purpose).

In addition, we disagree with appellants that the argument was incurable. *See Gordon v. Leasman*, 365 S.W.3d 109, 117 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (argument that if jury's verdict restricted to corporation, there is "never going to be a penny paid in this case" was not incurable). In the context of counsel's discussion of evidence to support a finding that Halsey, individually, defrauded the Hales, the argument was "not so extreme as to be incapable of cure." *See Phillips*, 288 S.W.3d at 883. The trial court did not err by denying appellants' motion for new trial complaining of these arguments.

### 6. Conclusion on challenged jury arguments

Appellants contend that "viewing the record as a whole, the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by the argument to agree to a verdict contrary to that which he would have agreed but for such argument," citing *Goforth v. Alvey*, 271 S.W.2d at 404–05. In *Goforth*, however, the supreme court concluded, "[w]e are well convinced that [the argument] was not, as a matter of law, calculated to cause or that it probably did cause the rendition of an improper judgment," where "[t]he argument was not of the type characterized generally as prejudicial and inflammatory, and neither did it introduce into the case any new evidence of a material nature." *See id.* at 404.

We conclude that there was evidence to support the jury's findings on each subject addressed in the arguments at issue. And, considering the record as a whole, we conclude that the arguments were "not so extreme as to be incapable of cure." *See Phillips*, 288 S.W.3d at 883 (argument about need to send message to doctors in community not "same class of impropriety" as incurable arguments such as appeals to racial prejudice). We overrule appellants' fourth issue.

## V. DAMAGES

In the trial court's judgment, the Hales were awarded damages against both BAH and Halsey. The damages awarded against BAH are based on the jury's findings of violations of the DTPA.[5] The damages awarded against Halsey are based on the jury's findings of fraud.[6] Against BAH, the Hales were awarded (1) $14,069.27, constituting five percent of the $249,000 reduction in market value of the home, plus interest; (2) $1.4 million in additional damages for knowing and intentional conduct; and (3) $293,000 in attorney's fees. Against Halsey individually, the Hales were awarded (1) $281,385.56, constituting reduction in market value of the home plus interest; and (2) $2,225,000 in exemplary damages for fraud. Against BAH and Halsey jointly, the Hales were awarded (1) $800,000 in mental anguish damages for intentional and knowing conduct, plus interest, to Paige; (2) $800,000 in mental anguish damages for intentional and knowing conduct, plus interest, to Bryon; and (3) court costs and prejudgment interest. BAH and Halsey jointly received a $115,000 credit for the Hales' settlement with AGTM.

Appellants make several challenges to these awards. In their second issue, appellants argue the trial court erred by granting judgment for the Hales because the economic loss rule bars recovery of tort damages. In their sixth issue, appellants challenge the sufficiency of the evidence to support the damages awarded to the Hales in the trial court's judgment. They also contend the amounts awarded violate due process and the applicable statutory caps, and are not supported by the pleadings.

---

[5] The jury found BAH engaged in false, misleading, and deceptive acts and practices, unconscionable conduct, and breaches of warranty that were a producing cause of damages to the Hales. The jury also found that BAH's conduct was knowing and intentional. The jury awarded actual and additional damages for these violations, as well as damages for mental anguish. The jury also made findings of the Hales' reasonable and necessary attorney's fees.

[6] The jury found by clear and convincing evidence that Halsey committed fraud that was a proximate cause of harm to the Hales. The jury made findings of the reasonable cost of repair, the reduction in market value, the past mental anguish of both of the Hales, and exemplary damages.

## A. Economic Loss Rule

Appellants contend that the economic loss rule bars the Hales' tort claims. But the economic loss rule does not bar recovery of tort damages in fraud cases. *Formosa Plastics Corp.*, 960 S.W.2d at 46. In *Formosa Plastics Corp.*, the court explained that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent misrepresentations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Id.* at 47. The judgment against appellants in this case awards the Hales damages for Halsey's fraud and BAH's deceptive trade practices. Consequently, the economic loss rule does not bar these damages. *Id.*; *see also Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 306 (Tex. 2006) (where plaintiff proved defendant never intended to perform contract, she could assert fraud and DTPA claims). We overrule appellants' second issue.

## B. Damage Awards

In their sixth issue, appellants contend that because "this case is a breach of contract case," an award of exemplary damages and mental anguish damages is improper as a matter of law. They also contend that damages for diminution in value are not recoverable in breach of contract cases, and that the Hales' recovery is limited to damages for the cost of repair. We disagree.

Judgment was rendered for the Hales on the jury's findings of fraud and violations of the DTPA. A plaintiff may recover economic damages, mental anguish, and exemplary damages for fraud. *Chapa*, 212 S.W.3d at 304. And a plaintiff may likewise recover economic damages, mental anguish, attorney's fees, and additional damages for violation of the DTPA. *See id.* (citing TEX. BUS. & COM. CODE ANN. § 17.50(b)(1)). Also, under the DTPA, a consumer who prevails may recover damages for mental anguish if the trier of fact finds that the conduct of the

defendant was committed knowingly or intentionally. TEX. BUS. & COM. CODE ANN. § 17.50(b)(1) (specifying damages available for mental anguish). Damages for appellants' DTPA violations are not limited to the cost of repair. *See Ludt v. McCollum*, 762 S.W.2d 575, 576 (Tex. 1988) (per curiam) (plaintiff could have recovered damages under DTPA for both cost of repair and permanent reduction in market value after repair with pleading, proof, and favorable jury findings).

### 1. Mental anguish damages

Appellants next contend that even if mental anguish damages were recoverable, the jury's awards to Bryon and Paige were "grossly excessive" and not supported by legally and factually sufficient evidence. Appellate courts must "closely scrutinize" awards of damages for mental anguish. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997) (citing *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). The supreme court has explained that "[t]here must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded." *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). "Mental anguish is only compensable if it causes a 'substantial disruption in . . . daily routine' or 'a high degree of mental pain and distress.'" *Id.* (quoting *Parkway Co.*, 901 S.W.2d at 444, and *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002)). "'Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required.'" *Id.* (quoting *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011)).

In *Bentley*, 94 S.W.3d at 606, and in *Saenz v. Fidelity & Guaranty Insurance Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996), the court discussed the requirement that appellate courts review whether there is any evidence to support the amount of damages awarded:

> While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. Compensation can only be for mental anguish that causes "substantial disruption in . . . daily routine" or "a high degree of mental pain and distress." *Parkway*, 901 S.W.2d at 444. There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations.

*Saenz*, 925 S.W.2d at 614; *see also Bentley*, 94 S.W.3d at 606 (discussing *Saenz*). In *Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Inc.*, the court explained that damages for non-pecuniary harm such as emotional distress "do not require certainty of actual monetized loss," but instead "are measured by an amount that 'a reasonable person could possibly estimate as fair compensation.'" 434 S.W.3d 142, 153 (Tex. 2014) (quoting RESTATEMENT (SECOND) OF TORTS § 905 cmt. i).

Here, the jury awarded the amount of $800,000 in mental anguish damages to each of the Hales under all three causes of action presented in the charge, for appellants' deceptive trade practices, negligence, and fraud. Five witnesses testified at trial about Paige's and Bryon's mental anguish.

Julia Hale, the Hales' 20-year-old daughter, described her mother's problems resulting from appellants' conduct as "a downhill spiral." She testified that Paige lost sleep, was depressed, and took medication for her depression:

> Q. And let's talk about your mom. What have you—what would you say about her emotionally going through the problems with that house?
>
> A. I would say emotionally it's not easy, definitely a downhill spiral since moving from Plano. I mean, she's definitely held it together in front of us but I just—I know, I mean, I hear her up at night at 1:00 a.m. just downstairs. I can hear her because she can't sleep or definitely—

–31–

definitely it's impacted the depression. And to her mind, that's not easy to live with.

Q. Why do you say that? Why do you say that she's had that depression?

A. Because this was her dream home. This is something she actually wanted since probably she was about my age and she spent her life savings on it, and that's enough to make me depressed, as well.

Q. How do you know she's depressed by it? What is it that she does or says that makes you reach that conclusion?

A. Well, I know she has become medicated for it. And the way she acts, she's—sometimes it'll just—you know, she just wants to be alone or she'll just sit there and cry or just very different aspects.

Q. The crying, is that—

A. It's not easy to watch, especially when it's due to her house not, you know, somebody inflicting pain on her.

Q. How often would you say that occurs?

A. It's hard now because I'm not home very often. Probably more so in high school, especially towards the end of my high school when it was getting really worse, and they didn't know what they should be doing.

Q. How often would you say it would actually bring her to tears?

A. I don't know. Maybe every other month, monthly, I don't know. I mean, I'm sure she did it more without me seeing.

Similarly, the Hales' son Parker, aged 22, testified:

Q. The—your mom, particularly what I want to focus on is how you think these problems have affected her emotionally?

A. Yeah. Pretty, pretty poorly, you know. . . . And basically from the time that we realized that the foundation was too low to even have steps onto our front porch and back porch, you know, she—that was the beginning. And, you know, ever since, she's been pretty upset about a lot of different things. But that was—that was the beginning when she noticed that the house was just going to be ground level. I mean, she was pretty upset, in tears. And from then on out, you know, it's just one problem after another. It's been really stressful on her, really disappointing to her because, you know, it took a lot—it took many years just to plan this house out, and she—she didn't get what she wanted so. . .

–32–

Q. When is the last time you've seen her cry over this?

A. This week.

Q. Do you know what it was or did she say what it was that brought her to tears?

A. Well, I mean, she's under a lot of stress and under a lot of disappointment. You know, she's working trying to make sure that, you know, me and my sister go to college and can afford to do that and as well as still trying to deal with making improvements and fixing her house so that, you know, it's habitable. So, I mean, she's just under a lot of pressure and a lot of stress.

Q. How would you describe the toll—that this has affected her psyche or her emotionally? Would you say it was mild? Would you say it was—

A. Pretty strong.

Q. —severe?

A. Yeah. She—things are just different now. I mean, she's just tired and stressed a lot. And, you know, I mean, she's—she still puts on a happy face and fronts us that, you know, she's okay. But, I mean, I know she's pretty upset, you know, most of the time, stressed, tired.

Q. Does it seem pretty constant? . . .

A. Yes, sir.

Both Paige and Bryon testified that problems arising from their home had caused strain on their marriage; Bryon testified that the problems had "consumed our life and our relationship," while Paige testified, "We have had a couple of times where we've had to look at each other, and I've asked him, are we going to make it through this? Or are we going to get—or will we get a divorce?" Paige also testified that she often stays at work late to try to forget about the problems, but "I don't get a whole lot done . . . . I'm just very distracted at work." Bryon testified that due to condition of their home, he and Paige refused a request from Paige's employer to host an event at their home, and could not invite Julia's friends to "spend the night parties" when Julia was in middle school. Bryon testified that he and Paige were embarrassed

and humiliated by these refusals. He also testified to the constant disruptions in their lives as a result of the problems at their home and in efforts to resolve them. Although not dispositive by itself, the record reflects that both Bryon and Paige wept on the witness stand when describing their own and each other's emotional state.

James Hale, Bryon's father, testified that Bryon and Paige have been "very, very emotional" as a result of the problems with their home. He has observed Paige in tears as new damage has occurred. Bryon testified that both he and Paige are "extremely devastated." Paige testified that Bryon "doesn't sleep" and that his health had "definitely gotten worse" since the problems occurred at their home. All four of the Hales testified to constant disruptions of their family life over a period of years in dealing with the problems in their home. Bryon also testified:

> Q. Have you ever had thoughts or feelings that you were a failure to your wife and kids?
>
> A. It's been a tremendous amount of guilt and—and stress and—and arguments in what to do, what not to do, how to do it. It's consuming. (Talking simultaneously.)
>
> Q. Have you ever felt bad? Have you ever felt like a failure?
>
> A. The failure is right here, square on my shoulders. I picked the wrong builder.

Paige explained that their emotional problems were "constant":

> Q. . . . What was it in your mind that said, hey, we've got to come down here, hire a lawyer, and go through this sausage-making process?
>
> A. We looked at each other and said, he's just stringing us along.
>
> Q. And that's the way you felt? What do you feel today?
>
> A. (Pause) Life is not much fun anymore.
>
> Q. Does this thing weigh on you heavy?
>
> A. It's consumed -- it has consumed everything for years and --

Q. 2010 forward?

A. Yes.

Q. And would you say that the effect on you has been severe since 2010?

A. Yes.

Q. Would you say it's been constant?

A. Yes. It has been constant.

This testimony was "direct evidence of the nature, duration, or severity" of their mental anguish, "thus establishing a substantial disruption in [their] daily routine," and evidence that the Hales suffered "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Saenz*, 925 S.W.2d at 614 (quoting *Parkway Co.*, 901 S.W.2d at 444).

We must also address, however, the amount of the awards. The jury awarded each plaintiff $800,000 in mental anguish damages. The total, $1.6 million, is approximately six times the $249,000 the jury found in actual damages.[7] It is also almost four times the amount of mental anguish damages sought by the Hales in their disclosure responses filed before trial:

> C. Mental anguish in the amount for each Plaintiff of at least equal to the cost of repair based on the recommendations of Paragon Structural Engineering, Ltd. of at least $141,977.00 for foundation repairs set out in the Estimate of American Property Services plus at least $66,879.00 for cosmetic repairs as set out in the Estimate of American Property Services for a total cost of repair of at least $208,856.00

The response then listed two separate amounts of $208,856.00 as the mental anguish damages sought. In closing argument, the Hales did not suggest a specific amount for mental anguish

---

[7] The jury awarded the Hales $223,856 for "the reasonable costs of repairs necessary to cure damages resulting from any construction defects," and $249,000 for "the reduction in market value, if any, to the extent the reduction is due to structural failure." The Hales offered expert testimony at trial to support both of these amounts, and appellants do not challenge them on appeal.

damages; counsel referenced Paige's "gut wrenching" testimony in arguing that mental anguish damages were warranted for both Paige and Bryon.

In *Bentley*, the jury's award was more than forty times the amount awarded the plaintiff for damage to his reputation. *See Bentley*, 94 S.W.3d at 606 (setting aside award); *see also Lane v. Martinez*, No. 11-13-00247-CV, 2015 WL 5173034, at *9 (Tex. App.—Eastland Aug. 31, 2015, no pet. h.) (setting aside non-pecuniary damage award that was seventeen times more than pecuniary damage award). In a subsequent appeal of the *Bentley* case, the supreme court concluded that legally sufficient evidence supported the trial court's determination on remand that $150,000 would be "reasonable compensation" for Bentley's mental anguish. *Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004). This amount was equal to the jury's damage award for injury to Bentley's character and reputation. *See Bentley*, 94 S.W.3d at 605.

We conclude that although there is sufficient evidence to support an award of mental anguish damages to the Hales, the $1,600,000 amount awarded by the jury is not supported by the evidence. *See id.* We further conclude that the evidence is sufficient to support the amount of mental anguish damages sought by the Hales in their disclosure responses prior to trial, and that the amount of $208,856 the Hales sought for each plaintiff "would fairly and reasonably compensate" them for their mental anguish. *See Waste Mgmt. of Tex., Inc.*, 434 S.W.3d at 153; *see also MBR & Assocs., Inc. v. Lile*, No. 02-11-00431-CV, 2012 WL 4661665, at *13 (Tex. App.—Fort Worth Oct. 4, 2012, pet. denied) (mem. op.) (upholding past and future mental anguish damages of $300,000 where plaintiff established similar mental and emotional suffering from fraud and deceptive trade practices relating to foundation repair of plaintiff's home, and actual damages exceeded $200,000). Although the resulting ratio of mental anguish damages to the Hales' pecuniary loss is higher than the one-to-one ratio approved in *Bunton*, the jury's entire

verdict reflects an effort to fairly compensate the Hales for their actual injuries. *See Bunton*, 153 S.W.3d at 53; *Bentley*, 94 S.W.3d at 605.

If, as we conclude here, part of a damages verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); TEX. R. APP. P. 46.3 (court of appeals may suggest remittitur). Consequently, we suggest a remittitur of the portion of the mental anguish damages awarded to each plaintiff that exceeds the $208,856.00 amount each plaintiff sought prior to trial. And, as the prevailing party at trial, the Hales must be given the option of accepting the remittitur or having the case remanded for a new trial. *Bechtel Corp. v. CITGO Prods. Pipeline Co.*, 271 S.W.3d 898, 922 (Tex. App.—Austin 2008, no pet.).

We overrule the portion of appellants' sixth issue challenging the award of any mental anguish damages by the jury, and sustain the portion of the issue that challenges the sufficiency of the evidence to support mental anguish damages exceeding $208,856.00 for each plaintiff.

### 2. Additional and Exemplary Damages

Appellants next argue that the jury's awards of exemplary and additional damages are arbitrary, grossly excessive, not supported by legally and factually sufficient evidence, and "in violation of BAH and Halsey's constitutional rights." Appellants also contend the awards are in excess of the statutory cap on exemplary damages, citing civil practice and remedies code section 41.008. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008 (West 2015) (exemplary damages may not exceed amount equal to greater of $200,000 or two times amount of economic damages plus noneconomic damages not exceeding $750,000).[8]

---

[8] Appellants provide no further argument or analysis of this complaint, but we must consider the application of the cap as a question of law. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 157 (Tex. 2015) (statutory exemplary damages cap "applies as a matter of law" even in the absence of pleading or motion for new trial raising the issue).

Appellants' only arguments in support of these contentions are that the jury "obviously disregarded these factors because the evidence at trial indicated that BAH and Halsey had a negative net worth," and the construction of a home with foundation defects is not "such egregious conduct to justify the imposition of such a harsh penalty." And they again contend that any harm to the Hales resulted only from breach of contract, not fraud. They offer no further discussion or analysis.

Although the credibility of the witnesses and evidence was a matter for the jury to determine, and a jury has some discretion in the amount of additional and punitive damages it awards, there are both statutory and constitutional limits on the amounts awarded. We review punitive damage awards for excessiveness as well as for sufficiency of the evidence to support them. *See, e.g., Bunton*, 153 S.W.2d at 53 (stating factors to consider in appellate review).

### a. Statutory caps

We first conclude that the judgment against BAH for $1.4 million in DTPA additional damages was within the limits imposed by section 17.50(b)(1) of the DTPA. The jury made findings that BAH's misconduct was engaged in both "knowingly" and "intentionally." In light of these findings, section 17.50(b)(1) permits recovery of "not more than three times the amount of damages for mental anguish and economic damages." Here, the additional damages awarded in the judgment do not exceed three times the amounts found by the jury for economic damages ($249,000) and mental anguish ($800,000 for each plaintiff), and are within the statutory limits.[9]

We next conclude, however, that the judgment against Halsey for $2,225,000 in exemplary damages exceeds the statutory cap in section 41.008(b) of the civil practice and remedies code. Section 41.008(b) limits recovery of exemplary damages to an amount equal to

---

[9] We note that the statutory cap is not exceeded by the jury's award of $1.4 million even if mental anguish damages are remitted to $208,856 for each plaintiff, as discussed above. Because the jury found appellants' conduct was committed intentionally, the Hales may recover "not more than three times the amount of damages for mental anguish and economic damages." TEX. BUS. & COM. CODE ANN. § 17.50(b)(1). This calculation would still exceed $2 million in additional damages.

–38–

the greater of (1) two times the amount of economic damages, plus "an amount equal to any noneconomic damages found by the jury, not to exceed $750,000"; or (2) $200,000. The jury's finding of $249,000 in actual damages, doubled to $498,000, plus a maximum of $750,000 for the jury's findings of mental anguish damages results in a maximum award of punitive damages of $1,248,000. Consequently, the judgment's award of $2,225,000 exceeds this maximum by $977,000.

### b. Excessiveness

We must also review awards of additional damages under the DTPA and exemplary damage awards for excessiveness. *Leonard & Harral Packing Co. v. Ward*, 937 S.W.2d 425, 425 (Tex. 1996) (mem. op.).

### i. *Kraus* factors

We consider whether the evidence supports the award in light of the factors set forth in *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). *See Ward*, 937 S.W.2d at 425. The *Kraus* factors to consider in determining whether an award of exemplary damages is reasonable include (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Kraus*, 616 S.W.2d at 910.

Under the *Kraus* factors, the evidence here established that appellants defrauded the Hales. As we have discussed, the evidence was sufficient to support the jury's findings that as a result of appellants' fraud and deceptive trade practices, the Hales were induced into the contract to build their home. The Hales suffered mental anguish as well as financial harm. There was evidence that appellants accepted the Hales' payments but never intended to build the home they represented to the Hales. The record supports the jury's finding "by clear and convincing

evidence that the harm to the Hales resulted from fraud." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (West 2015) (exemplary damages may be awarded only if claimant proves by clear and convincing evidence that harm for which exemplary damages sought resulted from fraud, malice, or gross negligence).

Halsey's trial testimony also reflected his unwillingness to accept any responsibility for the defects in the Hales' home. *See, e.g., Bright v. Addison*, 171 S.W.3d 588, 605 (Tex. App.—Dallas 2005, pet. denied) (defendants' remorse is relevant factor in considering situation and sensibilities of the parties). Examples include Halsey's testimony that (1) he was not required to disclose to the Hales that he was not an expert in home building; (2) he might not have promised to provide a structural warranty; (3) the Hales were responsible for grading and drainage; (4) Moses was qualified to supervise foundation work; (5) Bryon made the ultimate decision on the type of foundation was necessary and appropriate for the site; (6) Mitchell Excavation was responsible for determining the proper height of the foundation; and (7) he was not "at all critical" of himself or BAH for the construction of the foundation:

> A.    No. I'm not critical of the company or myself.
>
> Q.    Not at all?
>
> A.    No.
>
> Q.    Zero?
>
> A.    Zero.

We also note that the jury's additional and exemplary damage awards reflect that the jury did not find credible Halsey's testimony regarding his net worth. Halsey testified he owned his residence, his wife's automobile, "and maybe a hundred thousand cash in the bank." He testified that BAH had "ongoing liabilities" but "no assets." Halsey testified his own net worth was "negative two and a half million dollars."

But Halsey admitted ownership of at least seven different business entities, some with global interests. Halsey admitted he held interests in two oil companies, one privately owned and the other publicly held, and "on paper," worked for both companies. He testified, however, that the publicly held company was worth "zero," and the privately owned company had a negative net worth. He testified he was a limited partner in another entity, Bonamour International, a skin care manufacturer. His ownership interest was approximately 35 to 40 percent, and at the time of trial, he was working at Bonamour "the majority of my time." He testified, however, that Bonamour also had a "negative net worth." Bonamour also "has a publicly traded entity," but the entity has "no operations," "no income," and assets of "maybe a hundred dollars in the bank." He admitted he is a limited partner in "a Hong Kong based company called JHP Ventures." The company "provides consulting services to foreign companies looking to get presence in the U.S. markets." But like the other four entities, JHP Ventures's "debts probably exceed its assets," so its net worth would be "zero." The same was true for DHM Ventures, a real estate project in which Halsey is a limited partner; Halsey testified this entity was "upside down by about 2 million U.S. dollars." DHP Partners, another entity he owns, has "$1,400 U.S. dollars, I think, in a checking account." NWH Management, a company owned by Halsey, has a negative value. In sum, according to Halsey, all seven entities (including the entities for which Halsey was working at the time of trial) had assets totaling $1,500 and liabilities in the millions of dollars.

Further cross-examination revealed, however, that JHP Ventures, in which Halsey had an 80 percent ownership interest, owned property in University Park with a value exceeding $1.2 million, as well as "a personal watercraft," a jet ski boat, and a home on Cedar Creek Lake. Halsey admitted he drove a Lamborghini automobile, but testified it was owned by "a friend of mine who lets me borrow it." The jury's awards of additional and punitive damages indicate that

–41–

the jury did not find credible Halsey's testimony that both he and BAH had only a negative net worth.

### ii. Due process factors

We also consider whether the award is unconstitutionally excessive because it violates due process constraints. *Bennett v. Reynolds*, 315 S.W.3d 867, 873 (Tex. 2010). To apply this standard, we consider (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* (citing *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)); *see also Chapa*, 212 S.W.2d at 308 (describing second factor as "the ratio between exemplary and compensatory damages"); *see also Owens Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex. 1998) (stating three "guideposts" for determining whether punitive damages award is unconstitutionally excessive); *see also Bunton*, 153 S.W.3d at 53–54 (these factors must be reviewed *de novo* to ensure that exemplary damages are not grossly disproportional to gravity of defendant's conduct) (citing *Cooper Indus. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 434–36 (2001)).

In considering the first due process factor, the degree of reprehensibility, we consider five nonexclusive factors, whether: (1) the harm inflicted was physical rather than economic; (2) the tortious conduct showed an indifference to or a reckless disregard for the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions, not just an isolated incident; and (5) the harm resulted from intentional malice, trickery or deceit, as opposed to mere accident. *Bennett*, 315 S.W.3d at 874 (citing *State Farm*, 538 U.S. at 419). We conclude the Hales offered evidence of the fourth and fifth factors. And as we have discussed in our review of the sufficiency of the evidence to support the jury's fraud and

deceptive trade practice findings, Halsey and BAH fraudulently induced the Hales into entering into a contract, Halsey and BAH did not intend to fulfill contractual obligations, and Halsey and BAH fraudulently concealed their wrongdoing from the Hales over a period of years.

In considering the second due process factor, disparity between the actual harm suffered by the plaintiffs and the punitive damages awarded, the supreme court has explained that although there is no "bright-line ratio," a punitive damages award that exceeds four times the amount of compensatory damages "'might be close to the line of constitutional impropriety.'" *Bennett*, 315 S.W.3d at 879; *Chapa*, 212 S.W.3d at 308 (quoting *State Farm*, 538 U.S. at 425). Here, the jury's award of $1.4 million in DTPA additional damages against BAH is between five and six times the $249,000 actual damages, and its award of $2,225,000 in exemplary damages against Halsey is almost nine times the amount of actual damages.

In *Chapa*, only one of the five reprehensibility factors existed, and the ratio between compensatory and punitive damages was 4.33. *Chapa*, 212 S.W.3d at 309. The court concluded, "[p]ushing exemplary damages to the absolute constitutional limit in a case like this leaves no room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions that endanger a large segment of the public." *Id.* at 310. The court concluded the punitive damages were constitutionally excessive. *Id.* The court reached a similar conclusion in *Bennett* on facts "not meaningfully distinguishable" from those in *Chapa*. *See Bennett*, 315 S.W.3d at 878.

The parties here offered no argument regarding the third due process factor, disparity between the award of exemplary damages and the civil penalties authorized or imposed in comparable cases. In the past we have considered the exemplary damages cap under section 41.008 to be relevant to this third factor. *See Lambert v. Lambert*, No. 05-08-00397-CV, 2009 WL 1493009, at *8 (Tex. App.—Dallas May 29, 2009, no pet.) (mem. op.). As discussed,

punitive damages in this case are capped at $1,248,000 based on the jury's findings of actual damages and mental anguish.

Having considered the relevant *Kraus* and due process factors, we conclude the jury's awards exceed the guidelines set forth in *Bennett* and *Chapa* for the type of harm suffered by the Hales as a result of appellants' conduct. But as with the award of mental anguish damages, there is sufficient evidence to support awards of DTPA additional damages and exemplary damages against appellants, consisting of the evidence we have detailed of appellants' knowing and intentional deceptive trade practices and fraud. We also conclude there is sufficient clear and convincing evidence to support an additional damage award against BAH of three times actual damages, equaling $747,000, and an exemplary damage award against Halsey of $915,712.[10] *See, e.g., Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 769 (Tex. App.—Dallas 2008, no pet.) (suggesting remittitur to $12,000, four times amount of compensatory damages found by the jury).

The judgment's award of additional damages of $1.4 million against BAH exceeds $747,000 by $653,000. The judgment's award of exemplary damages of $2,225,000 against Halsey exceeds $915,712 by $1,309,288. We therefore suggest a remittitur of these amounts by the Hales. *See* TEX. R. APP. P. 46.3; *see also McLeod v. Gyr*, 439 S.W.3d 639, 652–53 (Tex. App.—Dallas 2014, pet. denied) (suggesting remittitur of DTPA additional damages). If the remittiturs are timely filed, we will modify the judgment accordingly and affirm as modified. *See McLeod*, 439 S.W.3d at 653. If the remittiturs are not timely filed, we will remand the cause to the trial court for proceedings consistent with this opinion. *See* TEX. R. APP. P. 44.1(b)

---

[10] This amount is calculated using the statutory cap as a guide. Section 41.008 allows two times the amount of economic damages plus the amount of noneconomic damages not exceeding $750,000. TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b)(1). The jury found $249,000 in economic damages. And there was factually sufficient evidence to support mental anguish awards in the amount of $417,712 (or $208,956 per plaintiff). Adding these two amounts results in exemplary damages of $915,712, approximately 3.6 times the amount of actual damages.

(appellate court may not order separate trial solely on unliquidated damages if liability contested).

In suggesting remittitur, we are mindful of the supreme court's mandate that we must not substitute our judgment for the jury's. *See Larson*, 730 S.W.2d at 641. But we are also mindful of that court's constitutional mandate to scrutinize additional and exemplary damage awards for support in the evidence and for excessiveness. *Leonard & Harral Packing Co.*, 937 S.W.2d at 425 (*Kraus* factors must be applied to exemplary and additional damage awards to determine excessiveness); *see also Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994) (courts of appeals must carefully scrutinize punitive awards to ensure they are supported by the evidence). In this case, the Hales offered evidence that Halsey's and BAH's conduct warranted the imposition of exemplary and additional damages. The jury found this evidence to be clear and convincing. Only to the extent that the trial court's judgment exceeds constitutional and statutory limits on additional and exemplary damages, we sustain appellants' sixth issue and suggest remittitur.

### 3. Sufficiency of Pleadings

Appellants complain that the Hales' live trial pleading, the fourth amended petition, sought a maximum of $1,500,000, so that the trial court's judgment did not conform to the pleadings. Although the Hales filed fifth and sixth amended petitions after trial, appellants argue that the trial court erred by denying their motion to strike the amendments because (1) the Hales failed to seek leave of court to file the amended petitions in violation of rule 63, Texas Rules of Civil Procedure;[11] (2) the amendments were made without justification or excuse, constituted surprise, and were made at a time when appellants could not respond; and (3) the Hales'

---

[11] Because the record contains the Hales' motion seeking leave to amend and the trial court's order granting the motion, we do not address this contention further.

recovery in any event should be limited to the amounts stated in their responses to appellants' requests for disclosures.[12]

The Hales counter that the amendment did not surprise or prejudice appellants because appellants did not show they would have prepared any differently for trial to defend against the higher amount of damages sought. And a trial court has no discretion to refuse a trial amendment unless the opposing party presents evidence of surprise or prejudice, or the amendment is prejudicial on its face because it asserts a new cause of action or defense and the opposing party objects. TEX. R. CIV. P. 66; *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 64 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Similarly, a trial court "shall" grant leave to file an amended pleading unless there is a showing that the filing will operate as a surprise to the opposing party. TEX. R. CIV. P. 63; *Food Source, Inc. v. Zurich Ins. Co.*, 751 S.W.2d 596, 599 (Tex. App.—Dallas 1988, writ denied).

Additionally, "[a]mended pleadings may be filed up to the time judgment is signed." *Food Source, Inc.*, 751 S.W.2d at 599. Appellants argue that the amendment was offered "at a time when it was impossible for BAH or Halsey to respond or rebut" it, but they do not explain what evidence they were precluded from offering or what argument they could not assert because of the timing of the amendment. Their closing argument to the jury included requests that the jury limit any damages awarded to the cost of repair or the reduction in market price, amounts they contended were approximately $20,000 or $30,000. They also argued that any award of mental anguish damages should be "judge[d] . . . in relationship with the other damages in this case." They contended there was no fraud and that therefore no actual or punitive damages awards for fraud were appropriate. They cited to evidence in the record to support the amounts

---

[12] Appellants do not cite any record reference to establish that this contention was raised before the trial court, and we have found none. Because error was not preserved, we do not address this contention further. *See* TEX. R. APP. P. 33.1 (as prerequisite to appeal, record must show that complaint was made to trial court that stated grounds for the ruling sought, and that trial court ruled or refused to rule).

included in their argument. In sum, appellants presented evidence and argument that the Hales'

damages, if any, should be limited. There is no indication that appellants would have taken any

different position in light of an increase in the maximum amount of damages sought by the

Hales. And appellants did not establish that the amendment operated as a surprise to them or

resulted in prejudice. *See* TEX. RS. CIV. P. 63, 66. We overrule this portion of appellants' sixth

issue.

## VI. JUDGMENT AGAINST INDIVIDUAL DEFENDANT

In their third issue, appellants contend the trial court erred by granting judgment for the

Hales against Halsey individually "when at all relevant times he was acting in his capacity as

Manager and General Partner of BAH." Appellants further argue that as a limited partner of

BAH, Halsey was not liable for BAH's obligations unless he participated in control of the

business, citing section 153.102 of the Texas Business Organizations Code. *See* TEX. BUS.

ORGS. CODE ANN. § 153.102 (West 2012). Appellants also argue that an agent cannot be held

liable for claims or debts incurred on behalf of a disclosed principal.

But in addition to their claims against BAH, the Hales sued Halsey individually for his

own fraud and violations of the DTPA. As we explained in *Cimarron Hydrocarbons Corp. v.

Carpenter*, "[i]t is a longstanding rule in Texas that a corporate agent is personally liable for his

own fraudulent or tortious acts, even when acting within the course and scope of his

employment." 143 S.W.3d 560, 564 (Tex. App.—Dallas 2004, pet. denied). The rule also

applies to DTPA claims. *Miller v. Keyser*, 90 S.W.3d 712, 714 (Tex. 2002) (because DTPA

allows consumers to bring suit against "any person," "an agent may be held personally liable for

the misrepresentations he makes when acting within the scope of his employment").

The Hales asserted claims against Halsey, individually, for his own conduct. *See

Carpenter*, 143 S.W.3d at 565. Halsey personally made representations about the construction of

the Hales' home.  *See Miller*, 90 S.W.3d at 716.  The Hales offered evidence from which the jury could find that Halsey had no intention of fulfilling the promises at the time he made them.  Halsey is liable for his own fraud and DTPA violations.  *See id.* We overrule appellants' third issue.

## VII.  ADDITIONAL CAUSES OF ACTION

In their eighth issue, appellants contend that the Hales' negligence and breach of warranty claims fail as a matter of law.  Because judgment was not rendered on these claims, appellants raise the issue only in the alternative, in the event we sustain their other issues.  We have not done so, and need not consider this issue further.

## VIII.  CONCLUSION

We overrule appellants' first, second, third, fourth, fifth, and seventh issues.  We need not address their eighth issue. We sustain appellants' sixth issue only to the extent of suggesting remittitur of (1) mental anguish damages exceeding $208,856 per plaintiff; (2) additional damages exceeding $747,000 against BAH; and (3) exemplary damages exceeding $915,712 against Halsey.  In accordance with rule 46.3 of the Texas Rules of Appellate Procedure, if the Hales file with this Court within fifteen (15) days from the date of this opinion a remittitur of (1) $591,144 in mental anguish damages for Bryon Hale; (2) $591,144 in mental anguish damages for Paige Hale; (3) $653,000 of the additional damages awarded against BAH; and (4) $1,309,288 of the exemplary damages awarded against Halsey, we will modify the trial court's judgment to award the Hales $208,856 in mental anguish damages for each plaintiff, $747,000 in additional damages against BAH, and $915,712 in punitive damages against Halsey, and affirm the trial court's judgment as modified.

If the suggested remittiturs are not filed timely, we will reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 44.1(b).

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

141137F.P05